IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PACIFIC KIDNEY &
HYPERTENSION, LLC,

        Plaintiff,

v.

DR. CLAIRE T. KASSAKIAN,

        Defendant.

Case No. 3:16-cv-0025-SI

OPINION AND ORDER

James M. Barrett and Leah C. Lively, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., 222 SW Columbia Street, Suite 1500, Portland, OR 97201. Of Attorneys for Plaintiff.

Joel P. Leonard and John D. Ostrander, ELLIOTT, OSTRANDER & PRESTON, P.C., Union Bank of California Tower, 707 SW Washington Street, Suite 1500, Portland, OR 97205. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

        Plaintiff Pacific Kidney & Hypertension, LLC ("Plaintiff" or "Pacific Kidney") seeks a temporary restraining order and preliminary injunction against Defendant Dr. Claire T. Kassakian ("Defendant" or "Dr. Kassakian"). Dkt. 3. On January 19, 2016, the Court held a hearing on Plaintiff's motion for a temporary restraining order. Pacific Kidney appeared through its counsel James M. Barrett of OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

PAGE 1 – OPINION AND ORDER

Dr. Kassakian appeared through her counsel, Joel P. Leonard and John D. Ostrander of

ELLIOTT, OSTRANDER & PRESTON, P.C. For the reasons stated below, Plaintiff's motion

for a temporary restraining order is granted in part and denied in part.

## STANDARDS

In deciding whether to grant a motion for a temporary restraining order ("TRO"), courts

look to substantially the same factors that apply to a court's decision on whether to issue a

preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*, 240 F.3d 832, 839

n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res.*

*Def. Council*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must

show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer

irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of

the plaintiff; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20 (rejecting the

Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its

likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's

alternative "serious questions" test. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship

balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the

other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction

may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious

questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and

the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012)

(citing *Cottrell*).

Finally, a temporary restraining order is necessarily of a shorter and more limited duration than a preliminary injunction.[1] Thus, the application of the relevant factors may differ, depending on whether the court is considering a temporary restraining order or a preliminary injunction.[2] Indeed, the two factors most likely to be affected by whether the motion at issue is for a TRO or a preliminary injunction are the "balancing of the equities among the parties" and "the public interest."

## FINDINGS OF FACT

Based on the evidence presented by the parties thus far, and subject to revision after the hearing on Plaintiff's motion for preliminary injunction, the Court finds the following facts more likely true than not:

1.      Pacific Kidney is a limited liability company with its principal place of business in Colorado. It provides nephrology services to patients in the Portland, Oregon metropolitan area who need treatment from physicians with expertise in kidney disease. Pacific Kidney offers its services at several office locations as well as at hospitals and dialysis clinics. Dr. Robert Provenzano, M.D., a resident and citizen of Michigan, is the sole member of Pacific Kidney.

---

[1] The duration of a temporary restraining order issued without notice may not exceed 14 days but may be extended once for an additional 14 days for good cause; in addition, the reasons for such an extension must be entered in the record. Fed. R. Civ. P. 65(b)(2). When a temporary restraining order is issued with notice and after a hearing, however, the 14-day limit for such orders issued without notice does not apply. *See Horn Abbot Ltd. v. Sarsaparilla Ltd.*, 601 F. Supp. 360, 368 n.12 (N.D. Ill. 1984). Nevertheless, absent consent of the parties, "[a] court may not extend a 'TRO' indefinitely, even upon notice and a hearing." *Id*. Accordingly, unless the parties agree otherwise, a court should schedule a preliminary injunction hearing to occur not later than 28 days after the date that the court first issues a temporary restraining order.

[2] A preliminary injunction also is of limited duration because it may not extend beyond the life of the lawsuit. That is the role of a permanent injunction, which a court may enter as part of a final judgment, when appropriate. A preliminary injunction, however, may last for months, if not years, while the lawsuit progresses toward its conclusion.

2.      Dr. Kassakian is a physician who provides nephrology services to patients with

kidney disease. Beginning September 1, 2014, Dr. Kassakian was employed by Pacific Kidney in

Portland, Oregon. Shortly before she began working for Pacific Kidney in Portland,

Dr. Kassakian moved to Oregon from Rhode Island. More than six months before she began

working for Pacific Kidney, Pacific Kidney informed Dr. Kassakian in a written employment

offer that nonsolicitation and noncompetition agreements would be required as a condition of her

employment. Dr. Kassakian signed a Physician Employment Agreement (the "Agreement"),

containing nonsolicitation and noncompetition agreements, with Pacific Kidney in

February 2014.

3.      Paragraph 1 of the Physician Covenants, entitled "Non-Solicitation," as contained

in Exhibit B of the Agreement, provides, among other things:

> [F]or a period of two (2) years after the termination of Physician's
> [Dr. Kassakian's] employment for any reason (whether voluntary
> or involuntary), Physician will not, directly or indirectly, take any
> action that results or may be expected to result in (i) soliciting,
> diverting, or interfering with any relationship that [Pacific Kidney]
> has with any patients or customers of [Pacific Kidney] . . . .

Paragraph 2 of the Physician Covenants, entitled "Non-Competition," provides, among other

things:

> [F]or a period of one (1) year after the termination of Physician's
> [Dr. Kassakian's] employment for any reason (whether voluntary
> or involuntary), Physician [Dr. Kassakian] will not, without prior
> consent of [Pacific Kidney], directly or indirectly . . . establish or
> otherwise assist any entity or individual in the development or
> management of any program or service related to Nephrology
> Services within a twenty-five (25) mile radius of any Health Care
> Facility location where Physician practices during the Initial Term
> or Renewal Term (collectively, the "Restricted Area") that is or
> will be in competition with any of the health care services provided
> by or on behalf of [Pacific Kidney] or [Pacific Kidney's]
> management company within the Restricted Area.

Paragraph 2 further provides:

In the event that Physician [Dr. Kassakian] remains in the
Restricted Area but chooses to restrict Physician's medical practice
in violation of [her non-competition covenant], then Physician
[Dr. Kassakian]  agrees to pay [Pacific Kidney] liquidated damages
in an amount [equal to the total cash compensation paid to
Physician during Physician's last twelve (12) months of
employment,] which is reasonably calculated to permit [Pacific
Kidney] to recoup its substantial investment, including lost profits,
in order to continue to make critical health care services available
to the public in the Restricted Area. Physician [Dr. Kassakian] and
[Pacific Kidney] agree that this provision is intended to permit
[Pacific Kidney] to reasonably protect [Pacific Kidney's] financial
investment in promoting the general public's access to health care
services, this provision does not unreasonably restrict the general
public from accessing Physician's services and the limitations
imposed by this provision are both reasonable and sufficiently
limited in scope that they will not interfere with the public's
interests.

Paragraph 3 of the Physician Covenants, entitled "Liquidated Damages," provides:

Physician's [Dr. Kassakian's] liquidated damages will equal the
total cash compensation paid to Physician during Physician's last
twelve (12) months of employment with [Pacific Kidney]:
provided that if, upon termination, Physician has been employed
by [Pacific Kidney] for less than twelve (12) months, Physician's
total cash compensation through the termination date will be
annualized, and the liquidated damages amount will be equal to the
annualized amount. To the extent that the physician breaches this
Agreement and fails to pay the liquidated damages within thirty
(30) days of the notice in Section 2, above, then Physician will be
liable for the full damages to [Pacific Kidney], including, but not
limited to, the liquidated damages.

Paragraph 5 of the Physician Covenants, entitled "Reasonableness," provides:

The Parties acknowledge and agree that a more precise
measurement of damages is not feasible and that they accept the
amount as determined by Section 3 above as the damages in fact
and a reasonable amount intended to take into account the
substantial costs, expenses and resources invested in Physician's
[Dr. Kassakian's] medical practice by [Pacific Kidney], in relation
to Physician's services to the general public in the Restricted Area.
In the event that the amount of liquidated damages under Section 3
above is deemed by a court of competent jurisdiction to be
unreasonable, the court will in good faith reform this Section 3
above to provide a liquidated damages amount that is reasonable.

Paragraph 7 of the Physician Covenants, entitled "Equitable Relief," provides:

> Physician [Dr. Kassakian] agrees that any violation by Physician of any covenant in this Exhibit B will or would cause [Pacific Kidney] to suffer irreparable injury, the exact amount of which will be difficult to ascertain. For that reason, Physician agrees that [Pacific Kidney] will be entitled, as a matter of right, to a temporary, preliminary and/or permanent injunction and/or other injunctive relief, ex parte or otherwise, from any court of competent jurisdiction, restraining any further violations by Physician. Such injunctive relief will be in addition to and in no way limit any and all other remedies [Pacific Kidney] will have in law and equity for the enforcement of such covenants and provisions. Physician consents and stipulates to the entry of such injunctive relief in such a court prohibiting him from any further violation of the covenants and provisions of this Exhibit B.

Dkt. 5-1, at Exhibit B-1 through B-2.

4.    During her employment with Pacific Kidney, Dr. Kassakian held a position as a nephrologist and treated patients with severe, chronic renal problems. Nephrologists are in high demand, both nationally and in the Portland area. Dr. Kassakian received an annual salary of $144,000 based on a four-day work week (0.80 FTE) with additional bonuses and benefits.

5.    As required by Or. Rev. Stat. ("ORS") § 653.295, at least two weeks before her first day of work with Pacific Kidney, Dr. Kassakian was informed that a noncompetition agreement was required as a condition of her employment. In addition, Dr. Kassakian was a "professional" employee of Pacific Kidney within the meaning of ORS § 653.020(3). Pacific Kidney has a "protectable interest" because Dr. Kassakian had access to Pacific Kidney's "trade secrets," as defined by ORS § 646.461, at least in the form of a confidential customer list during her employment. Finally, Dr, Kassakian's salary was greater than the median family income for a four-person family, as determined by the United States Census Bureau.

6.    In October 2015, Dr. Kassakian notified Pacific Kidney of her intention to terminate her employment with Pacific Kidney effective January 19, 2016. According to

Dr. Kassakian, she decided to leave Pacific Kidney "because of the poor quality of care it delivered and the lack of managerial progress to improve it." Dkt. 13, ¶ 11. Dr. Kassakian provided Pacific Kidney with 90 days' advance notice of her intention to take employment with Northwest Renal Clinic, Inc. ("NW Renal"), a direct competitor of Pacific Kidney in the provision of nephrology services. *Id*. On November 27, 2015, Dr. Kassakian informed Pacific Kidney that she intended to work at NW Renal's eastside clinic, which is located within the Restricted Area.

7.     On December 28, 2015, in an attempt to satisfy the liquidated damages provision of the Agreement, Dr. Kassakian tendered a check to Pacific Kidney for $145,299. Pacific Kidney promptly rejected and returned the check.

8.     Dr. Kassakian is replacing a departing physician at NW Renal and has 65 new patients—whom she did not previously treat while at Pacific Kidney—scheduled to see her in her first two weeks of employment at NW Renal. According to the Clinic President of NW Renal, Dr. Clayton Smiley, M.D., NW Renal "did not look for Dr. Kassakian to bring along any patients because our practice already has a full schedule/roster of patients." Dkt. 14, ¶ 5. "Moreover, from the physician's perspective, there is not a competitive market for nephrology patients in the Portland vicinity because already there is a vast supply of patients, and too few nephrologists to treat them." *Id.* Dr. Smiley also explained that "there is currently a wait time of two to three months for scheduling new patients with Northwest Renal Clinic and Dr. Kassakian's presence will help to alleviate that wait time and permit patients to be seen in a more timely manner." *Id*.

9.     Dr. Kassakian has not solicited any of her existing patients at Pacific Kidney to follow her to her new practice at NW Renal. Dkt. 13, ¶ 14.

10.    Several of Dr. Kassakian's patients at Pacific Kidney, however, have notified NW Renal that they would like to continue receiving treatment from Dr. Kassakian at NW Renal. One of Dr. Kassakian's former patients at Pacific Kindey is S.R., who is a 78 year old physician. In early December 2015, S.R. received a call from Pacific Kidney, requesting that he reschedule his January 19, 2016 appointment. "The clinic did not disclose that Dr. Kassakian was leaving." Dkt. 16, ¶ 3. After Christmas, S.R. received a letter from Pacific Kidney, again requesting that he reschedule his appointment. The letter stated that Dr. Kassakian was leaving Pacific Kidney but did not disclose where she was going or how she could be reached. *Id.* ¶ 4; Dkt. 16, Ex. A. After receiving this letter, S.R. "asked the front desk reception at the clinic where she [Dr. Kassakian] was going. They said that they did not know." *Id.* ¶ 4.[3] It is a reasonable inference that this may be a materially false statement by Pacific Kidney, depending on what was actually known by the speaker. S.R. adds: "Dr. Kassakian never asked me to continue care as her patient and never even told me she was leaving." *Id.* S.R. desires to continue to be seen and treated by Dr. Kassakian. *Id.* ¶ 5.

11.    Another of Dr. Kassakian's former patients at Pacific Kidney is B.F. She is a 37 year old woman who received a kidney transplant eight months ago. At Pacific Kidney, B.F. was treated by Dr. S.I. and by Dr. Kassakian. B.F. did not believe that she was receiving the attention

---

[3] Plaintiff Pacific Kidney objects to S.R.'s testimony about what Pacific Kidney's receptionist told S.R. Plaintiff argues that this statement is inadmissible hearsay, and cites *Testerman v. Somerton Elementary Sch. Dist.*, 2008 WL 5082164, at *2 (D. Ariz. Nov. 26, 2008). That case, however, is factually distinguishable. In *Testerman*, the court addressed a statement by an unidentified district employee that contained an imbedded statement from a third party. In that case, there was no basis for the court to conclude that the statement from the unidentified employee was within the scope of his or her employment relationship. In contrast, S.R.'s testimony of what was said to him by the person at the reception desk of Pacific Kidney does appear to be within the scope of that employee's employment relationship with Pacific Kidney. Accordingly, Pacific Kidney's objection is overruled, and the statement is admissible under Fed. R. Evid. 801(d)(2)(D). The parties, of course, are free to bolster or refute this conclusion at the upcoming preliminary injunction hearing.

from Dr. S.I. that B.F. needed and she believed that her health had suffered as a result. She does, however, have confidence in Dr. Kassakian and requested that Dr. Kassakian continue her care. According to B.F., she "was told by [Pacific Kidney] that [Dr. Kassakian] was moving out of the area and that [B.F.] could not have her." Dkt. 18, ¶ 2.[4] Based on B.F.'s testimony, Pacific Kidney may have given her materially false information. B.F. adds that she does "not want to be forced to seek care from a different nephrologist; I would simply like to still be able to receive treatment from my own doctor, Claire Kassakian." *Id.*

12.    Another of Dr. Kassakian's former patients at Pacific Kidney is M.P. She is a 67 year old woman who has been treated by Dr. Kassakian for the past six months. During her last visit, Dr. Kassakian informed M.P. that Dr. Kassakian would be leaving Pacific Kidney. When M.P. asked Dr. Kassakian where the doctor would be going, Dr. Kassakian replied that she was not at liberty to disclose that information. M.P. does "not want to be forced to seek care from a different nephrologist," but simply wants to continue to receive treatment from Dr. Kassakian. Dkt. 19, ¶¶ 1-3.

13.    Another of Dr. Kassakian's former patients at Pacific Kidney is A.C. He is a 42 year old man who also received a kidney transplant about eight months ago. A.C. has been treated by Dr. Kassakian for more than a year. A.C. recently received a letter from Pacific Kidney stating that Dr. Kassakian "was moving out of the area." Dkt. 17, ¶ 2. If A.C.'s summary of the contents of this letter is correct, this could be another materially false statement by Pacific Kidney.[5] A.C. states that he "called NW Renal to schedule an appointment with a new doctor.

---

[4] Pacific Kidney also objects to this statement, and its objection is overruled. The statement is admissible under Fed. R. Evid. 801(d)(2)(D). *See supra* n.3.

[5] The letter would be admissible as a statement of a party-opponent under Fed. R. Evid. 801(d)(2). A.C.'s testimony about its content, however, is more problematic. Generally, an original or duplicate of a writing is needed in order to prove its contents. Fed. R. Evid. 1002,

They asked me who my previous provider was and when I told them, they informed me that Dr. Kassakian would be working there."[6] "'It was like a miracle' to find her this way, and I was very pleased that I could continue under her care. My relationship with Dr. Kassakian is important to my health. She is an excellent doctor and has given me excellent care, which I very much need and appreciate." Dkt. 17, ¶¶ 3-4.

14.     Ethics Opinion 9.02 of the American Medical Association ("AMA") Code of Medical Ethics provides in relevant part:

> Covenants-not-to-compete restrict competition, can disrupt continuity of care, and may limit access to care.
>
> Physicians should not enter into covenants that:
>
> (a) unreasonably restrict the right of a physician to practice medicine for a specified period of time or in a specified geographic area on termination of a contractual relationship; and
>
> (b) *do not make reasonable accommodation for patients' choice of physician*.

AMA Code of Medical Ethics, Opinion 9.02 (emphasis added) (http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion902.page) (last visited on Jan. 18, 2016); *see also* Dkt. 21-9.

15.     Ethics Opinion 9.06 of the AMA Code of Medical Ethics provides in relevant part:

---

1003. Other evidence, however, may be offered instead following an adequate explanation. Fed. R. Evid. 1004. For purposes of the pending temporary restraining order, the Court will provisionally accept A.C.'s summary of the letter's contents, particularly because the letter purportedly came from Pacific Kidney, which should be in a position to produce a copy if it disagrees with A.C.'s description. The Court would expect to see a copy of this letter, however, at the preliminary injunction hearing.

[6] The statements from NW Renal are not received for the truth of the matters asserted, but only to provide context for A.C.'s response.

> *Free choice of physicians is the right of every individual.* One may
> select and change at will one's physicians, or one may choose a
> medical care plan such as that provided by a closed panel or group
> practice or health maintenance or service organization. *The
> individual's freedom to select a preferred system of health care
> and free competition among physicians and alternative systems of
> care are prerequisites of ethical practice and optimal patient care.*

AMA Code of Medical Ethics, Opinion 9.06 (emphasis added) (http://www.ama-

assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion906.page) (last

visited on Jan. 18, 2016).[7]

## CONCLUSIONS OF LAW

1.       Pacific Kidney has shown a likelihood of success on the merits of its breach of

contract claim; at the minimum there are "serious questions" going to the merits of Pacific

Kidney's breach of contract claim.[8]

2.       "Irreparable harm" encompasses harm to a company's goodwill, reputation, loss

of client relationships, and financial damage. *See Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841.

Pacific Kidney will likely suffer some irreparable harm in the form of loss of client relationships

and accompanying financial damage in the absence of at least some temporary injunctive relief

that prohibits Defendant from soliciting Pacific Kidney's patients. Pacific Kidney, however, has

not presented evidence that it will likely suffer harm to its goodwill or reputation in the absence

of temporary injunctive relief.[9]

---

[7] The Court takes judicial notice of AMA Ethics Opinion 9.06 under Fed. R. Evid. 201.

[8] Based on the evidence presented thus far, the Court is not prepared to reach any conclusions regarding Pacific Kidney's breach of fiduciary duty claim. For purposes of the pending motion, however, a TRO may be entered based on Pacific Kidney's contract claim.

[9] Under the *Restatement (Second) of Contracts*, a plaintiff may obtain specific performance or an injunction to enforce a non-compete clause in a contract even when the contract also provides for liquidated damages. *Restatement (Second) of Contracts* § 361 (1981) ("Merely by providing for liquidated damages, the parties are not taken to have fixed a price to

3.      "To qualify for injunctive relief, the plaintiffs must establish that 'the balance of equities tips in [their] favor.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20 (alteration in original)). "In assessing whether the plaintiffs have met this burden, the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'" *Stormans*, 586 F.3d at 1138 (citation omitted). Here, the non-speculative damage to Pacific Kidney is modest, at most. Similarly, the non-speculative damage to Dr. Kassakian is modest because she can continue her practice seeing new patients provided she does so outside of the 25-mile radius Restricted Area.

---

be paid for the privilege not to perform."). Although no Oregon appellate court has expressly applied § 361, the Oregon Supreme Court has upheld a statute that allows for both injunctive relief and liquidated damages in the event of a contract breach. *See Or. Growers' Co-op. Ass'n v. Lentz*, 107 Or. 561 (1923). In *Oregon Growers' Co-op*, the court upheld § 6954 of Oregon Laws, as amended by Chapter 260, L. 1921, which provided for injunctive relief as well as liquidated damages for a marketing association whose members breached the association's agreement. In upholding the statute, the court stated, "it must be obvious that an action at law to recover the stipulated damages would not afford to the plaintiff a full, adequate and complete remedy for the wrong done to the association, and indirectly to its members by a member's breach of his contract." *Id.* at 580. The Oregon Supreme Court has repeatedly cited *Oregon Growers' Co-op* approvingly. *See, e.g., Fishermen's Mktg. Ass'n, Inc. v. Wilson*, 279 Or. 259, 264 (1977) ("This court, in 1923, stated its understanding of the reasons why the preceding session of the legislature had provided for injunctive relief as well as liquidated damages . . . .").

Other courts also have allowed both injunctive relief and liquidated damages when the liquidated damages would inadequately compensate a plaintiff and the parties did not intend to provide a true alternative to performance. Courts usually emphasize one or the other of these requirements rather than both. *See, e.g., Vacold LLC v. Cerami*, 545 F.3d 114, 130 (2d Cir. 2008) ("Although a liquidated damages provision precludes a party from recovering lost profits and other measures of damages, it does not prevent a party from seeking specific performance, absent an express provision to this effect." (citations omitted) (emphasis in original)); *Washel v. Bryant*, 770 N.E.2d 902, 906 (Ind. Ct. App. 2002) ("The right to injunctive relief arises in an employment context, as in this case, when the remedy at law is inadequate. The liquidated damages clause in the parties' agreement does not obviate [the plaintiff's] right to injunctive relief."); *U-Haul Co. of N. C. v. Jones*, 269 N.C. 284, 287 (1967) ("The mere insertion in the contract of a clause describing the sum to be recovered for a breach as liquidated damages, but which were not intended to be payable in return for the privilege of doing the acts forbidden by the contract, will not exclude the equitable remedy, and is regarded as put there for the purpose of settling the damages, if there should be a suit and recovery for a breach." (quoting *Tobacco Growers' Co-op. Ass'n v. Jones*, 185 N.C. 265, 284 (1923) (quotation marks omitted)).

4.      Under the facts presented in this case, the most significant factor in deciding whether to grant a temporary restraining order (and, if so, the scope of any such order) appears to be the fourth factor: the public interest. There is, of course, a public interest in upholding the law and having parties abide by their legal duties, but that is not the only consideration in this factor. *See Pashby v. Delia*, 709 F.3d 307, 330 (4th Cir. 2013) ("[T]he district court could find that the likelihood of success on the merits satisfied the public interest prong only if other considerations did not meaningfully weigh on that factor.").

In addition, the Court recognizes that the parties "agreed" in paragraph 2 ("Non-Competition") of the Physician Covenants portion (Exhibit B) of their Agreement that the non-competition "provision does not unreasonably restrict the general public from accessing Physician's [Dr. Kassakian's] services and the limitations imposed by this provision are both reasonable and sufficiently limited in scope that they will not interfere with the public's interests." The parties' "agreement," however does not displace Court's obligation to make an independent judgment regarding whether the requested injunctive relief is in the public interest. *See, e.g.*, *Baker's Aid, a Div. of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) ("contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate"); *Firemen's Ins. Co. of Newark, N.J. v. Keating*, 753 F.Supp. 1146, 1154 (S.D.N.Y. 1990) ("The [contractual provision], likewise, does not, by its mere presence in the [contracts], satisfy the requirement that plaintiff make a showing of likely irreparable harm before the Court will grant its motion for a preliminary injunction. To the contrary, the Court must fully apply the same test for irreparable harm that it would were the [provision] not to exist.") (citation omitted).

Moreover, the Supreme Court has directed:

> A preliminary injunction is an extraordinary remedy never
> awarded as of right. . . . "In exercising their sound discretion,
> courts of equity should pay particular regard for the public
> consequences in employing the extraordinary remedy of
> injunction."

*Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). As

the Ninth Circuit has clarified:

> When the reach of an injunction is narrow, limited only to the
> parties, and has no impact on non-parties, the public interest will
> be "at most a neutral factor in the analysis rather than one that
> favor[s] [granting or] denying the preliminary injunction." *See
> Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003). If,
> however, the impact of an injunction reaches beyond the parties,
> carrying with it a potential for public consequences, the public
> interest will be relevant to whether the district court grants the
> preliminary injunction. *See Sammartano v. First Judicial Dist.
> Court*, 303 F.3d 959, 965 (9th Cir. 2002) ("'In cases where the
> public interest is involved, the district court must also examine
> whether the public interest favors the plaintiff.'") (alteration
> omitted) (*quoting Fund for Animals v. Lujan*, 962 F.2d 1391, 1400
> (9th Cir. 1992)); *see also Golden Gate Rest. Ass'n v. City & Cnty.
> of S.F.*, 512 F.3d 1112, 1126 (9th Cir. 2008). "[When] an
> injunction is asked which will adversely affect a public interest ...
> the court may in the public interest withhold relief until a final
> determination of the rights of the parties, though the postponement
> may be burdensome to the plaintiff." *Weinberger v. Romero–
> Barcelo*, 456 U.S. 305, 312–13 (1982). In fact, "courts ... should
> pay particular regard for the public consequences in employing the
> extraordinary remedy of injunction." *Id*. at 312.

*Stormans*, 586 F.3d at 1138-39 (ellipses in original).

5.      Former patients of Dr. Kassakian who want to continue to be treated by her will

affirmatively seek her out and will locate her if they are provided with timely and accurate

information. If a former patient of Dr. Kassakian desires to continue to be treated by her and that

patient is denied that opportunity to be seen by Dr. Kassakian as a result of Pacific Kidney's

invocation of the "non-competition" clause in the Agreement, that patient's sense of well-being

and receipt of adequate care likely will be significantly diminished. In addition, due to the likely

increased waiting time to see another physician qualified in this area, for example, the actual well-being of that patient also may be diminished. Enforcement of the non-competition agreement under these circumstances would not be in the public interest.

6.    In addition, as Dr. Smiley explained, Dr. Kassakian was not hired to bring any patients from Pacific Kidney, but to serve the patients at NW Renal who were previously being treated by a physician who left the state. Dr. Smiley also noted that "from the physician's perspective, there is not a competitive market for nephrology patients in the Portland vicinity because already there is a vast supply of patients, and too few nephrologists to treat them." He added that "there is currently a waiting time of two to three months for scheduling new patients with Northwest Renal Clinic and Dr. Kassakian's presence will help to alleviate that wait time and permit patients to be seen in a more timely manner." Enforcement of the non-competition agreement under these circumstances would not be in the public interest.

7.    The Court observes that Pacific Kidney relies on two Oregon appellate cases, *McCallum v. Asbury*, 238 Or. 257 (1964), and *Ladd v. Hikes*, 55 Or. App. 801 (1982), for the proposition that the enforcement of a physician's non-competition agreement does not violate Oregon public policy. The Court has closely reviewed those two cases. In *McCallum*, three individuals practiced medicine in a partnership. The plaintiff sued to dissolve the partnership and the remaining partners counterclaimed for an injunction to enforce against the plaintiff a restrictive covenant that would prohibit the plaintiff from practicing medicine for ten years in Corvallis, Oregon, or within 30 miles of that city. The trial court denied all relief to all parties, and the Oregon Supreme Court reversed on both points. Although the plaintiff argued that he will suffer severe hardship and "that the community will suffer if the injunction is allowed," 238 Or. at 262, the Oregon Supreme Court found, as a factual matter, to the contrary:

> The only evidence that the city of Corvallis will suffer by the
> removal of the plaintiff to another city came from the doctor with
> whom the plaintiff is presently sharing office space. The other
> evidence in the record indicates that surgical patients in Corvallis
> will not suffer undue hardship if the plaintiff is required to live up
> to the bargain he made when he became a partner in the clinic.

*McCallum*, 238 Or. at 264-65. Thus, *McCallum* may support the proposition that, in the abstract,

a physician's non-competition agreement is not necessarily void as against public policy. That

conclusion, however, does little to inform the analysis when a court facing a request for

injunctive relief is presented with persuasive evidence that the requested relief is not in the

public interest.

8.    The Oregon Court of Appeals in *Ladd* also considered a claim by a medical

partnership operating a clinic in Corvallis, Oregon, to enjoin the defendant from the practice of

medicine in the area of the City of Corvallis based on a non-competition clause in the parties'

agreement. The trial court denied the injunction, the plaintiffs appealed, and the Oregon Court of

Appeals reversed based on *McCallum*. The Oregon Court of Appeals noted that after *McCallum*

was decided by the Oregon Supreme Court in 1964, the Oregon Medical Association "adopted a

resolution to the effect that the use of such restrictive covenants are 'not generally conceived in

the public interest.'" *Ladd*, 55 Or. App. at 805. The Oregon Court of Appeals, however,

considered itself bound by the earlier decision of the Oregon Supreme Court for the general

proposition that non-competition clauses among physicians are not *per se* void as against public

policy and the appellate court found no specific factual findings from the trial court sufficient to

support denying injunctive relief in this case.  The Oregon Court of Appeals majority opinion

held:

> The opinions of the Supreme Court upholding such provisions in a
> medical contract are binding upon this court. Until such time as
> that court proscribes such provisions as being contrary to public
> policy when used by the medical profession, this court will enforce

them. Under the factual findings of the trial court, differentiated from his legal conclusions, we see no reason not to enforce the provision.

*Ladd*, 55 Or. App. at 806-7 (footnote omitted).

One of the three judges in *Ladd*, however, dissented. Although that judge based his

dissent on the conclusion that the plaintiff has not shown that injunctive relief is needed, that

dissenting judge also stated:

> I would prefer to base my dissent on the ground that a covenant not to compete between or among members of the medical profession is not enforceable as a matter of public policy. However, the majority is correct in saying that the Supreme Court has upheld a covenant, essentially identical to the one here involved, between partners in the same medical clinic as these plaintiffs, where the clinic sought enforcement against a withdrawing partner. *McCallum v. Asbury*, 238 Or. 257, 393 P.2d 774 (1964). Others, too, have been approved. *Hunter v. Straube*, 273 Or. 720, 543 P.2d 278 (1976). We are not free to overrule those cases, but, I am hopeful the Supreme Court will reconsider them and adopt a public policy for this state recognizing that the medical profession is affected with a public interest which precludes its members from agreeing among themselves that one or more of them may not fill the public need for his, her or their services in a given community.

*Ladd*, 55 Or. App. at 807 (Buttler, P.J., dissenting).

9.    The AMA Ethics Opinions were not in place when the Oregon Supreme Court

decided *McCallum*.[10] Based on that intervening circumstance, it is possible that the Oregon

Supreme Court today would decline to continue to follow *McCallum*. This is especially so in

light of the portion of the AMA Ethics Opinion 9.02 that provides that physicians should not

enter into restrictive covenants that "do not make reasonable accommodation for patients' choice

---

[10] *See generally* X. Johnson, "Noncompetition Clauses in Physcian Employment Contracts in Oregon," 76 Or. L. Rev. 195, 204-5 (1997).

of physician." Ultimately, however, this may not be a decision for this Court to make.[11] Thus, this Court does not base its ruling on the pending motion on the proposition that a physician's noncompetition agreement is always void as against public policy, or even that it is always void when it does not make reasonable accommodation for patients' choices. As a policy matter in Oregon, that is a question that only may be decided by the Oregon Supreme Court in exercising its common law authority or by the Oregon Legislature.

10.     The grounds for the Court's ruling here is that, based on the specific evidence presented to the Court thus far and the Court's specific factual findings described above, a temporary restraining order enjoining Defendant from soliciting her former patients is appropriate but a broader order enjoining Defendant from continuing to serve critically ill patients suffering from kidney disease needing a local physician with nephrology expertise, in the circumstances of the current situation in the local area, is not in the public interest.

11.     Finally, the Court notes that other district courts have denied injunctive relief upon finding that an injunction would negatively affect the well-being and even convenience of patients and consumers. *See, e.g.*, *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp*., 712 F. Supp. 2d 1285, 1292 (M.D. Fla. 2010) (denying a permanent injunction based on evidence that "millions of innocent contact lens wearers will suffer real adverse consequences if sale of [the defendant's contact lens brand] is enjoined" and that "[t]here will also be significant

---

[11] In a diversity case, the Court must follow state law. Where there is no state statute on point and the state's highest court has not decided the question, federal courts must follow state intermediate appellate courts in interpreting state law "in the absence of convincing evidence that the highest court in the state would decide differently." *Stoner v. N. Y. Life Ins. Co.*, 311 U.S. 464, 467 (1940). If there is no state appellate law, the Court must decide what the state's supreme court would likely do. Still, there must be something on which the federal court can base its decision. The federal court's duty "is to ascertain and apply the existing [state law], not to predict that [the state] may change its law." *Mangold v. Cal. Pub. Util. Comm'n*, 67 F.3d 1470, 1479 (9th Cir. 1995) (quoting *Klingebiel v. Lockheed Aircraft Corp.*, 494 F.2d 345, 346 (9th Cir. 1974)) (internal quotation marks omitted).

disruption, confusion and cost (estimated to be in the hundreds of millions of dollars) caused by [the defendant's] patients being abruptly told that the contact lens for which they have been fitted and with which they are satisfied, is no longer available"); *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, 2009 WL 920300, at *8 (D. Ariz. Mar. 31, 2009), *aff'd*, 670 F.3d 1171 (Fed. Cir. 2012), *opinion vacated in part on other grounds on reh'g en banc*, 476 F. App'x 747 (Fed. Cir. 2012) (holding that permanently enjoining the sale of the defendant's medical equipment would harm the public interest after "focus[ing] on the practical consequences—for real patients and surgeons—of granting Plaintiffs' requested remedy"); *z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 443-44 (E.D. Tex. 2006) (declining to enjoin Microsoft's product sales or order Microsoft's servers deactivated based on a finding that "it is likely that any minor disruption to the distribution of the products in question . . . would have an effect on the public due to the public's undisputed and enormous reliance on these products" and that "unsuspecting public consumers would undoubtably suffer some negative consequences").

## TEMPORARY RESTRAINING ORDER

**IT IS ORDERED** that Plaintiff's Motion for Temporary Restraining Order is **GRANTED IN PART** as follows:

1.      Until this Court orders otherwise and except as otherwise expressly permitted by this Temporary Restraining Order, for the next 28 days,[12]or until such time as the parties agree in writing to terminate, amend, or supersede this TRO, Dr. Kassakian is immediately enjoined from directly or indirectly soliciting patients of Pacific Kidney, including but not limited to any

---

[12] *See supra* n.1. The Court has scheduled the preliminary injunction hearing in this matter to occur within 28 days from the date of this Order.

patients whom Dr. Kassakian personally saw, examined, or treated while Dr. Kassakian was employed by Pacific Kidney.

2.      Notwithstanding paragraph 1, Dr. Kassakian may see, examine, and treat at NW Renal any of her former patients whom she previously saw, examined, or treated at Pacific Kidney, provided that she did not directly or indirectly solicit those patients to follow her to NW Renal. The category of former patients whom Dr. Kassakian may continue to see, examine, or treat includes, but is not limited to, the patients identified in this Opinion and Order as S.R., B.F., M.P., and A.C.

3.      Dr. Kassakian shall not use, disclose, or rely on confidential or trade secret information belonging to Pacific Kidney for the benefit of herself or any other entity.

4.      This Order does not prohibit Dr. Kassakian from continuing her teaching duties at Providence Portland's Internal Medicine Residency Program or seeing patients directly connected with those duties.

5.      The parties may engage in expedited discovery, within the scope of Rule 26 of the Federal Rules of Civil Procedure, in a timeframe that allows for the exchange of documents, responses to discovery requests, and the taking of depositions at least three (3) days before the preliminary injunction hearing scheduled below.

6.      Pacific Kidney shall post a surety bond of $2,500 not later than January 26, 2016.

7.      Dr. Kassakian shall appear on February 16, 2016, in Courtroom 13B of the United States District Courthouse, 1000 S.W. Third Avenue, Portland, Oregon, at 2:00 p.m. to show cause, if any, why a preliminary injunction should not issue continuing the foregoing injunctive relief or other equitable relief as ordered by the Court.

**CONCLUSION**

Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 3)

is GRANTED IN PART AND DENIED IN PART as set forth in this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 19th day of January, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge